Affirmed in Part and Reversed and Remanded in Part and Opinion filed August 31, 2010.

In
The

Fourteenth
Court of Appeals



NO. 14-09-00624-CV



Catherine
Gannon, M.D., Jochen Profit, M.D., Paul Allencherril, M.D., and Baylor College
of Medicine, Lisa Havins, MSN, RN, NNP, Carol Anselmo, MSN, RN, NNP, and Texas
Children's Hospital, Appellants 

v.

Lamar and Traci
Wyche, Individually and on Behalf of Kyla Wyche, a Minor, Appellees 



On Appeal from
the 212th District Court

Galveston County, Texas

Trial Court
Cause No. 08CV0782



 

OPINION

This is a healthcare-liability case governed by
chapter 74 of the Texas Civil Practice and Remedies Code.[1]  Lamar and
Traci Wyche, individually and on behalf of their daughter, Kyla Wyche, sued
Catherine Gannon, M.D., Jochen Profit, M.D., Baylor College of Medicine, Paul
Allencherril, M.D. (collectively, “the doctors”), Lisa Havins, MSN, RN, NNP,
Carol Anselmo, MSN, RN, NNP, and Texas Children’s Hospital (collectively, “the
nurse practitioners”) for alleged medical malpractice.[2]  The Wyches
served the defendants with expert reports prepared by Harley Aaron Rotbart,
M.D., a physician, and NiKole Poulsen Armstrong, RN, MSM, NNP-BC, a neonatal
nurse practitioner.  The doctors and the nurse practitioners moved to dismiss
the Wyches’ healthcare-liability claims on the basis of inadequate expert
reports, but the trial court denied their motions.  This interlocutory appeal
followed.

In this appeal, we consider whether Dr. Rotbart properly
relied on an unsworn statement allegedly made by Traci Wyche in formulating his
opinions.  We also consider whether Dr. Rotbart’s and Nurse Armstrong’s expert
reports may be read together to satisfy the element of causation as to the
nurse practitioners, even though Dr. Rotbart’s causation opinions do not specifically
mention the nurse practitioners or the hospital where they work and his report expressly
addresses only the doctors.  On this record, we conclude that Dr. Rotbart could
rely on Traci Wyche’s statement, but his expert report is inadequate to satisfy
the element of causation as to the nurse practioners even when read together
with Nurse Armstrong’s report.  Accordingly, we affirm in part and reverse and
remand in part.

I

            Kyla
Wyche was born prematurely on May 5, 2006 and was admitted to Texas Children’s
Hospital.  While at Texas Children’s Hospital, Kyla had IVs placed at various
sites on her body and at various times.  On May 11, 2006, Dr. Catherine Gannon
and Carol Anselmo noted that an IV that had been placed in Kyla’s left foot had
“infiltrated.”  The area around the IV in Kyla’s left foot was puffy, red,
edematous, and firm, and the IV was discontinued.  On May 12, Anselmo noted a
pinpoint-sized green pustule on Kyla’s left foot, which she cleansed and
cleared.  She also discussed it with Dr. Gannon.  Neither Anselmo nor Dr.
Gannon obtained cultures of the green pus or documented an assessment of the
left lower extremity.

            On
May 13 and 14, Lisa Havins and Dr. Jochen Profit attended Kyla.  The Wyches
allege that neither documented an assessment, examination, or evaluation of
Kyla’s left foot and leg, even though her foot continued to appear red,
swollen, “tight,” and hot.  Kyla was discharged from Texas Children’s Hospital
on May 14.  According to the Wyches, the swelling and redness in Kyla’s foot
continued.  By May 20, Kyla’s left leg continued to be swollen and red, her
left foot was tender and painful, and she had developed a fever.  The Wyches
took Kyla to the emergency department at Twelve Oaks Hospital, where Dr. Paul
Allencherril saw her.  Dr. Allencherril diagnosed cellulitis and ordered Kyla
Wyche discharged home with a prescription for Amoxicillin.

            On
May 22, Kyla was seen by a pediatrician who admitted her to Texas Children’s
Hospital through the emergency room.  She was diagnosed with Staphylococcus
aureas bacterial infection, cellulitis from left wound drainage, left femoral
osteomyelitis and left hip septic arthritis as well as associated
thrombophlebitis of the deep left femoral and ileac veins.  On May 24, Kyla
underwent surgery for left hip excision, irrigation, debridement, and
nephrotomy of the left hip, and was treated with a prolonged course of IV
antibiotic therapy.  The Wyches allege that, because of the delays in diagnosis
and timely treatment of the infection that began at the IV site in the left
foot, Kyla suffered serious, permanent, and disabling injuries.  

II

            On
appeal, Dr. Gannon, Dr. Profit, and Baylor College of Medicine contend the
trial court erred in denying their motion to dismiss because the opinions in
Dr. Rotbart’s expert report on standard of care, breach, and causation are
based solely on an unsworn, unauthenticated, and undated written statement that
is unreliable and untrustworthy on its face, and Dr. Rotbart’s reliance on the
statement was unreasonable because the assumed facts in the statement are not
corroborated by, and conflict with, the medical records.  Dr. Allencherril separately
appeals, contending in two issues that Dr. Rotbart’s report is inadequate
because it is based on Traci Wyche’s unsworn statement and Dr. Rotbart’s
opinions are conclusory.  Lisa Havins, Carol Anselmo, and Texas Children’s
Hospital also separately appeal, contending that an expert may not rely on an
unsworn statement that contradicts the medical records and that the reports of
Dr. Rotbart and Nurse Armstrong fail to address the element of causation as to
them.  All of the appellants assert that the expert reports constitute “no
report at all” as to them and therefore the trial court had no discretion but
to grant their motions to dismiss and award reasonable attorney’s fees and
costs of court.  

            We
will first address the common issue of Dr. Rotbart’s reliance on the alleged
unsworn statement of Traci Wyche (“Traci Wyche’s statement”) and then address
the appellants’ individual issues.

A

            A
medical-malpractice plaintiff must timely serve on each defendant or each
defendant’s attorney one or more expert reports that set out (1) the applicable
standard of care, (2) the manner in which the defendant’s care failed to
satisfy that standard, and (3) the causal relationship between the defendant’s
failure and the injury or damages claimed.  See Tex. Civ. Prac. &
Rem Code Ann. § 74.351(a), (r)(6).  The plaintiff may satisfy the statutory
requirements by serving reports of separate experts regarding different
physicians or health care providers or regarding different issues arising from
the conduct of a physician or health care provider.  Id. at § 74.351(i). 
However, only a physician may give opinion testimony about the causal
relationship between the claimed injury, harm, or damages and the alleged
departure from the applicable standard of care.  See id. at §
74.351(r)(5)(C).

            Generally,
if the plaintiff fails to timely serve an expert report within the statutory
deadline the trial court must dismiss the lawsuit with prejudice.  See id.
§ 74.351(b).  But if the plaintiff has timely served a report on the defendant,
the trial court cannot dismiss the lawsuit unless the report does not represent
an objective good-faith effort to comply with the statutory requirements for
such a report.  See id. § 74.351(l).  If an expert report has not been timely
“served” because “elements of the report are found deficient,” the court may
grant one thirty-day extension to the plaintiff to cure the deficiency.  Id.
§ 74.351(c). 

            We
review a trial court’s denial of a motion to dismiss under section 74.351 for
abuse of discretion.  Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,
46 S.W.3d 873, 875 (Tex. 2001); Group v. Vicento, 164 S.W.3d 724, 727
(Tex. App.—Houston [14th Dist.] 2005, pet. denied).  A trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner without reference
to any guiding rules or principles.  Larson v. Downing, 197 S.W.3d 303,
304–05 (Tex. 2006); Mem’l Hermann Healthcare Sys. v. Burrell, 230 S.W.3d
755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  To the extent
resolution of the issue before the trial court requires interpretation of the
statute itself, we apply a de novo standard.  Mokkala v. Mead, 178
S.W.3d 66, 70 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

B

            The
doctors and the nurse practitioners make a variety of arguments concerning Dr.
Rotbart’s reliance on Traci Wyche’s statement in formulating his opinions.  The
statement itself is entitled “Traci Wyche Statement,” and it contains a
day-by-day description of Kyla’s condition and symptoms from May 11, 2006,
through May 20, 2006, when the Wyches took her to the emergency room at Twelve
Oaks Hospital.  It concludes with a printed signature block and signature of
“Traci Wyche.”  Two other people signed the statement, and each added “I agree
to the statement” next to their signatures.  One of the signatures is
illegible.  

1

            To
understand the appellants’ complaints, it is helpful to set out portions of Dr.
Rotbart’s report reflecting his reliance on Traci Wyche’s statement.  For
example, in Dr. Rotbart’s report,[3]
he lists the medical records he reviewed in forming his opinion, and then he
states:

I have also reviewed a statement of Traci Wyche in which
she recalls events regarding her daughter Kyla Wyche.  For purposes of this
report, I assume her statement to be true and correct. 

Next,
in a section entitled “Review of Facts,” Dr. Rotbart recites a chronology of
events incorporating information from both the medical records and Traci
Wyche’s statement.  After that, in the discussion section of his report, Dr.
Rotbart states the following:

            A finding of cellulitis in infants who are less
than thirty days old presents an extremely serious situation requiring
aggressive and immediate antimicrobial treatment.  Initiation of oral
antibiotics is simply insufficient to treat this condition and prevent its
progression.  It is therefore mandatory that infants who are less than thirty
days old with cellulitis be immediately hospitalized for IV antimicrobial
therapy and consultation with an infectious disease specialist.

            Since there are no documented assessments of
Kyla Wyche’s left lower extremity by the healthcare providers on May 12, 13, or
14, 2006, I cannot determine from the record whether or not the erythema,
swelling and induration noted on May 11, 2006 persisted, progressed or
resolved.  According to Traci Wyche’s statement, there was persistence and
progression during this period of time.  She states that on May 11, 2006 the
area where the IV had been was red, swollen and tight.  She states that on May
12, 2006 the redness, swelling and tightness persisted and on either May 12 or
May 13, the left foot felt hot and blisters were forming.  By May 13, 2006
Traci Wyche states that in addition to the area feeling hot, the redness
appeared to progress toward the bottom of the foot and appeared to be a little
more swollen.  She states that on May 14, 2006, the left foot continued to be
red, swollen, tight and hot.

Dr.
Rotbart then outlines numerous medical record entries he opines support the
conclusion that the peripheral IV site in the left foot was the source of the
infection in Kyla’s left leg.  Additionally, he notes that when Kyla Wyche was
re-admitted to Texas Children’s Hospital on May 22, 2006, there was “significant
boney change” which he states is “consistent with an infection untreated for
ten days.”  He further opines that “[h]ad Kyla Wyche received care and
treatment of the infection prior to discharge, it is very likely the infection
would not have progressed to cellulitis, osteomyelitis, septic hip arthritis,
septic thrombophlebitis, bacteremia and the other medical conditions which were
diagnosed during her hospitalization beginning May 22, 2006. 

            Dr.
Rotbart’s report continues with sections setting out the standard of care,
breach of the standard of care, and causation for Drs. Gannon, Profit, and
Allencherril.  Concerning the standard of care for Drs. Gannon and Profit, Dr.
Rotbart states:

            All previous and new peripheral IV sites should
be carefully inspected for signs of local inflammation, palpable cord or
expressed pus.  This is especially true in neonates who have peripheral
intravenous lines for parenteral nutrition.  Infection should be suspected if
there are local signs of inflammation (e.g., swelling, erythema, tenderness,
induration or purulent discharge) with or without fever.

            If signs of local inflammation or pus are
found, the findings of local inflammation and/or pus must be documented and the
site reassessed on a frequent basis to see if the signs of local inflammation
and pus persist, progress or resolve.  Persistence, progression or resolution
on re-evaluation should also be documented.  Documentation is especially important
when there is a transfer of care from one healthcare provider to another as occurred
in this case so that subsequent providers will be alerted to the problem.  

            If the signs of local inflammation or pus
persist or progress, empiric antimicrobial therapy should be initiated based on
Gram stain results when available and should include agents active against
Staphylococcus aureus.  In addition, blood cultures should be drawn. 
Exploration and excision of the vein should be carried out if there is
insufficient resolution because of the concern of progression to suppurative
thrombophlebitis.

Dr.
Rotbart then opines that Dr. Gannon breached the standard of care in these ways:

1.         Failing to document the condition and appearance
of the left foot and leg near the IV infiltrate site.  The presence of
persistent erythema, swelling and induration has been attested to by Traci
Wyche.  Documentation of the findings described by Ms. Wyche, or any other
findings, was imperative since the care of Kyla Wyche would be transferred to
Dr. Profit and Lisa Havins, NNP the following day.  Those caregivers needed to
be aware of the importance of re-evaluating the left lower extremity.

2          If, in addition to a finding of a green pustule,
there was persistent erythema, swelling and induration and the foot was warm or
hot to the touch, as attested to by Traci Wyche, then Dr. Gannon breached the
standard of care by

            (a)       failing to document that the foot was
warm or hot to the touch; 

            (b)       failing to culture the green pus and
obtain blood cultures; and 

            (c)       failing to begin empiric
antimicrobial therapy including agents active against Staphylococcus aureus.

Similarly,
Dr. Rotbart opined that Dr. Profit breached the standard of care in these ways:

1.         Failing to document the condition and appearance
of the left foot and leg near the IV infiltrate site to evaluate whether the
signs of infection had progressed from the previous day.  According to Traci Wyche’s
statement, the “redness appeared to be going toward the bottom of the foot and
it appeared to be a little more swollen than the previous day” and in addition
to continuing firmness and induration, the foot felt warm or hot;

2.         Upon finding progression of the signs of
infection, failing to:

            (a)       culture any exudates found and obtain
blood cultures; and 

            (b)       begin empiric antimicrobial therapy
including agents active against Staphylococcus aureus.

3.         Failing to cancel the discharge orders for Kyla Wyche
and order that her hospitalization be continued for further observation,
evaluation and treatment for infection.

Dr.
Rotbart then opines that, as a result of these breaches of the standard of care
by Dr. Gannon and Dr. Profit, Kyla was discharged from Texas Children’s
Hospital without receiving care and treatment for the infection in her left
lower extremity.  He further states that early care and treatment of localized
infection is required for curing the infection and preventing its predictably
progressive course if untreated.  In reasonable medical probability, he
concludes, care and treatment of Kyla’s infection before discharge would have
prevented the progression of the infection to the other, more severe medical
conditions that were diagnosed and treated during her readmission on May 22,
2006.

            Dr.
Rotbart also separately discusses the standard of care, breach, and causation
concerning Dr. Allencherril, the emergency-room physician who saw Kyla on May
20.  In summary, Dr. Rotbart states that the standard of care for a reasonable
and prudent emergency-room physician required that Kyla, an infant less than
thirty-days old with cellulitis, be admitted to the hospital for a complete
septic work-up and IV-antibiotic treatment under consultation with a neonatologist
and/or infectious disease specialist.  Dr. Rotbart opines that Dr. Allencherril
breached the standard of care by discharging Kyla from the emergency department
with a prescription for oral Amoxicillin, failing to recommend, request and/or
order that Kyla be admitted to a hospital for a complete septic work-up and IV
antibiotics, and failing to request consultation with a neonatologist and/or
specialist in infectious disease for appropriate antibiotic therapy.  Dr.
Rotbart explains the causal relationship as follows:

            As a result of the breach of the standard of
care by Dr. Allencherril, there was a delay of approximately thirty-four hours
in the initiation of IV antibiotic treatment for Kyla Wyche.  Since Kyla
Wyche’s infection had already progressed beyond localized IV site infection to
at least cellulitis by May 20, 2006, I cannot quantitate with certainty the
degree of subsequent harm and injury that would have been avoided, but in
reasonable medical probability, beginning appropriate IV antibiotic treatment
on May 20, 2006 instead of May 22, 2006 would have substantially decreased the
severity of the infectious complications including the conditions of
cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis, and
bacteremia.  

Dr.
Rotbart concludes his report with the opinions that all the doctors were
negligent in their care and treatment of Kyla and their negligence was a
proximate cause of the progression of infection in Kyla’s left lower extremity
to the more serious conditions.  

2

            The
appellants contend that a physician may not reasonably rely on an unsworn,
unauthenticated and undated written statement in forming opinions, especially
when it is contrary to the actual facts in the medical records.  Further, they
argue that Dr. Rotbart wrongly assumes Traci Wyche’s statement is true and
correct, and assert that the statement provides no assurance about the source
or reliability of the information conveyed in it or even about the identity of
the maker.  Without a trustworthy and reliable basis, they argue, an expert’s
opinions are conclusory and have no value in the eyes of the law.  See
Merrell Dow Pharms., Inc. v. Havner, 953 SW.2d 706, 714 (Tex. 1997) (“If
the foundational data underlying opinion testimony are unreliable, an expert
will not be permitted to base an opinion on that data because any opinion drawn
from that data is likewise unreliable.”).  Some of the doctors further assert
that the statement could have been made by anyone, even a janitor.

            Texas
Rule of Evidence 703 permits an expert to base an opinion on facts or data
“perceived by, reviewed by, or made known to” the expert.  Tex. R. Evid. 703. 
An expert may even consider inadmissible evidence if it is “of a type
reasonably relied upon by experts in the particular field in forming opinions
or inferences upon the subject.”  Id.  Thus, in many instances, experts
may rely on inadmissible hearsay, privileged communications, and other
information that the ordinary witness may not.  In re Christus Spohn Hosp.
Kleberg, 222 S.W.3d 434, 440 (Tex. 2007).  

            In
American Transitional Care Centers of Texas, Inc. v. Palacios the
supreme court did not require that an expert report must rise to the level of a
summary judgment affidavit or evidence admissible at trial.  See 46
S.W.3d at 878–79.  Instead, the Palacios court explained that the expert
report need represent only a good-faith effort to provide a fair summary of the
expert’s opinions.  Id. at 878.  And although the report must include
the expert’s opinion on each of the elements identified in the statute, it
“need not marshal all the plaintiff’s proof.”  Id.  To constitute a
good-faith effort, the report must provide enough information to fulfill two
purposes: (1) it must inform the defendant of the specific conduct the
plaintiff has called into question, and (2) it must provide a basis for the
trial court to conclude that the claims have merit.  Id. at 879.  As the
Palacios court stated, “to avoid dismissal, a plaintiff need not present
evidence in the report as if it were actually litigating the merits.  The
report can be informal in that the information in the report does not have to
meet the same requirements as the evidence offered in a summary-judgment
proceeding or at trial.”  Id.

            Although
the parties have not cited and we have found no reported Texas case on point,
several cases are instructive.  First, in Hiner v. Gaspard, the
plaintiff’s experts relied on medical records and a statement by the patient’s
wife recalling events during and after the alleged medical malpractice.  No.
09-07-240-CV, 2007 WL 2493471, at *3 (Tex. App.—Beaumont Sept. 6, 2007, pet.
denied) (mem. op).  On appeal, the defendants argued that the affidavit of the
patient’s wife was incompetent, hearsay, and based on conclusions, speculation,
and assumed facts.  Id. at *7.  The court rejected this argument,
stating: “Appellants cite no authorities that hold that an expert who is
preparing a report as required by Chapter 74 may not review documents that
would not be admissible into evidence at trial.  In addition, we note that Chapter
74 provides that any expert reports served ‘under this section’ are not
admissible into evidence and may not be used in ‘a deposition, trial, or other
proceeding.’”  Id.  The court continued, “Because Chapter 74 prohibits
the introduction of expert reports into evidence, the Legislature likely did
not intend that expert reports and the evidence reviewed by experts in
preparing the reports must comply with the rules of evidence.”  Id.  Further,
citing Rule 703 of the Texas Rules of Evidence, the court noted that even if
the rules of evidence applied, the appellants cited no authorities supporting
the proposition that the affidavit of the patient’s wife did not support the
type of facts or data reasonably relied upon by medical experts in preparing
the reports required by chapter 74.  Id. 

            In
Comstock v. Clark, Megan Comstock was given an overdose of sedation
medication during a procedure to extract her wisdom teeth and she suffered
permanent brain damage as a result.  See No. 09-07-300-CV, 2007 WL
3101992, at *1 (Tex. App.—Beaumont Oct. 25, 2007, pet. denied) (mem. op.).  Dr.
Orr, an anesthesiologist, wrote an expert report on causation on behalf of the
plaintiffs.  In preparing his report, Dr. Orr reviewed the medical records
pertaining to the alleged negligence and spoke with Megan’s mother—who was one
of the plaintiffs—regarding the events surrounding the procedure and her
present condition.  Id. at *5.  The court concluded that Dr. Orr’s
report sufficiently linked the facts to the healthcare providers’ breach of the
applicable standards of care.  Id.  In a footnote, the court
acknowledged the difference between an expert report’s sufficiency for purposes
of chapter 74 and admissibility at trial, stating:  “We do not imply or suggest
that an expert report’s sufficiency for purposes of Chapter 74 . . . immunizes
the report from a challenge that it is not sufficiently reliable to be admitted
before the trier of fact.  That type of challenge generally carries with it a
more developed record than is before us here in this preliminary proceeding.”  Id.
at n.1.

            The
doctors and nurse practitioners contend, however, that Traci Wyche’s statement
lacks the indicia of reliability present in the patient’s wife’s affidavit in Hiner
or the direct communication with the patient’s mother in Comstock.  They
primarily rely on case law addressing the reliability of the foundation of an
expert’s opinion at trial.  See Havner, 853 SW.2d 714; Gong v. Hirsch,
913 F.2d 1269, 1271–74 (7th Cir. 1990); In re “Agent Orange” Product Liab.
Litig., 611 F. Supp. 1223, 1246–50 (E.D.N.Y. 1985).[4]  They cite
no authority, however, for the proposition that, for purposes of chapter 74’s
expert-report requirement, the expert may not rely on information that may not
be admissible at trial in formulating his opinions.  

            Here,
Traci Wyche’s statement, much like the unsworn communication with the patient’s
mother in Comstock, provides Dr. Rotbart with information concerning
Kyla’s symptoms both during and after her discharge from Texas Children’s
Hospital.  See Comstock, 2007 WL 3101992, at *5.  And both the Hiner
and Comstock courts recognized that a trial court’s determination of the
adequacy of the plaintiff’s expert reports is a preliminary proceeding in which
the rules of evidence may not apply to either the expert reports or the
evidence the experts reviewed in preparing their reports.  See Hiner,
2007 2493471, at *7; Comstock, 2007 WL 3101992, at *5 n.1.  These
conclusions are consistent with the Palacios court’s instruction that an
expert report does not have to meet the same requirements as the evidence offered
in a summary-judgment proceeding or at trial.  Palacios, 46 S.W.3d at
879; see also Packard v. Guerra, 252 S.W.3d 511, 533–34 (Tex.
App.—Houston [14th Dist.] 2008, pet. denied) (noting expert’s reports are
nothing more than a preliminary showing that the plaintiffs have a viable claim
that is not frivolous or without expert support).

            The
appellants also complain that Dr. Rotbart’s reliance on Traci Wyche’s statement
is unreasonable because the “assumed facts” in the statement conflict with the
medical records also recited in his report. [5] 
Specifically, the medical records Dr. Rotbart summarizes in his report show
that Kyla was “doing well” when she was initially discharged from Texas
Children’s Hospital on May 14 and that the redness and infection on Kyla’s left
hip was not noticed by her mother until May 20, nearly a week later.  The
appellants also point to Dr. Rotbart’s statement that “Since there are no
documented assessments of Kyla’s left lower extremity by the healthcare
providers on May 12, 13 or 14, I cannot determine from the record whether or
not the erythema, swelling and induration noted on May 11, 2006 persisted
progressed or resolved.”  Consequently, they assert that Dr. Rotbart improperly
relied on “assumed facts” from Traci Wyche’s unsworn, unauthenticated statement
to opine against them on standard of care, breach and causation.[6]  

            We
conclude, however, that Dr. Rotbart’s report does not contradict the medical
records.  As noted above, Dr. Rotbart explained that the medical records were
silent, stating that “there are no documented assessments of Kyla Wyche’s left
lower extremity by the healthcare providers on May 12, 13 or 14, 2006 . . . .” 
Because the records were silent, Dr. Rotbart uses Traci Wyche’s statement
regarding the progression of Kyla’s symptoms beginning on May 11, 2006, to fill
in the gaps.  Moreover, it is undisputed that the medical records Dr. Rotbart
summarized showed that on May 11, 2006, the IV previously placed in Kyla
Wyche’s left foot had infiltrated and “the left leg was red, edematous and
firm.”  The next day, May 12, “a pinpoint sized green pustule” was seen on
Kyla’s left foot, which was cleaned and cleared.  Other medical records noted
are consistent in describing Kyla’s history of worsening symptoms following the
IV infiltrate.  Dr. Rotbart’s report also specifically addresses how Traci
Wyche’s statement and the medical record corroborate each other:

            The conclusion that the infection developed at
the site of the peripheral intravenous line in Kyla Wyche’s left foot and
progressed is supported by the statement of Traci Wyche.  Additionally, when
Kyla Wyche was re-admitted to Texas Children’s Hospital on May 22, 2006, there
was significant boney change.  This finding is consistent with an infection
untreated for ten days.  With the evidence of progression from the peripheral
IV site infection to deep tissue infection – bone, joint, venous and soft
tissue – by the time of admission to TCH, it is unlikely that the outward signs
of erythema, swelling and induration noted on May 11, 2006, resolved on May 12,
13 and 14, 2006 in a child not on antibiotic therapy.  It is more likely than not
that these signs and symptoms of local inflammation continued and progressed
from May 11, 2006 through the time of her discharge on May 14, 2006 as recalled
[by] Traci Wyche.  Had Kyla Wyche received care and treatment of the infection
prior to discharge, it is very likely the infection would not have progressed
to cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis,
bacteremia and the other medical conditions which were diagnosed during her
hospitalization beginning May 22, 2006.

Based
on the above, we conclude that the medical records do not contradict Dr.
Rotbart’s opinion so as to render his opinions unreasonable or unreliable for
purposes of chapter 74’s expert-report requirement.

            Even
assuming conflicts exist between the facts on which Dr. Rotbart relies and the
medical records, the crux of this case is a failure to assess, document, and
treat an infection originating at the site of the IV in Kyla’s left foot.  Accepting
the premise that an expert’s report may not contradict the medical records in
such a case would preclude a plaintiff from ever being able to satisfy the
expert-report requirement.  Further, the credibility and weight to be given to
the facts supporting the expert’s opinion is an issue for trial.  See Bidiwala
v. Cockerell, No. 05-08-01156-CV, 2009 WL 866380, at *2 (Tex. App.—Dallas Apr.
1, 2009, no pet.) (mem. op.); see also LMC Complete Automotive, Inc. v.
Burke, 229 S.W.3d 469, 479 (Tex. App.—Houston [1st Dist.] 2007, pet.
denied) (holding that credibility of plaintiff’s patient history on which
expert relied for medical causation opinion was “a fact issue that goes to the
weight, rather than the admissibility, of [the expert’s] causation opinion”).  Traci
Wyche’s veracity can be examined and the appellants can present contrary
evidence to challenge her claims at trial.  At this stage of the proceeding,
however, all that is required is that Dr. Rotbart’s expert report informs the
defendants of the specific conduct the plaintiffs have called into question and
provides a basis for the trial court to conclude that the claims have merit.  See
Palacios, 46 S.W.3d at 879.

            At
least one other court has addressed a similar issue.  In Bidiwala v. Cockerell,
Melanie Cockerell fell from a second-story balcony and injured her wrist,
ankle, and back. 2009 WL 866380, at *1.  She was transported to a medical
center where drug testing showed alcohol and cocaine in her system.  Id. 
Melanie was admitted to intensive care with plans for a lumbar fusion in about
a week, but over the next two and one-half days, she suffered an undiagnosed
pulmonary edema that ultimately led to a drop in blood pressure and cardiac
arrest and death.  Id.  In his report, the plaintiff’s expert relied in
part on the affidavit of Susan Cockerell, Melanie’s mother.  The expert opined
that the standard of care for Dr. Bidiwala, a neurosurgeon who consulted on
Melanie’s injuries and had planned to perform the lumbar fusion, included the
following:  “‘Statements made by the patient regarding difficulty breathing
should be reported and or charted and brought to the attention of the
appropriate physician.’”  Id. at *2.  The expert report further stated:

If Dr. Bidiwala was present when the patient stated that
she could not breathe or was having difficulty breathing, as set out in the
affidavit of Susan Cockerell, then Dr. Bidiwala breached the standard of care
by not reporting those statements to the attending physicians and by not taking
actions to assure that appropriate interventions were begun.  Further, there is
no evidence in the records that Dr. Bidiwala ever charted those statements of
the patient or otherwise reported those statements.  Nor is there any evidence
that Dr. Bidiwala took any steps to make sure that any interventions including
diagnostic tests or other therapeutic measures [were begun].

Id. 
Dr. Bidiwala argued that the only relevant inquiry was whether Dr. Bidiwala
heard any statement from Melanie; that the report, on its face, did not
indicate that Dr. Bidiwala actually heard the statement; and “the contingent
nature of the opinion on the breach of the standard of care” rendered the
causation opinions conclusory and insufficient.  Id.  Dr. Bidiwala
further argued that the trial court made prohibited inferences of whether or
not a statement made by Melanie was actually heard.  Id.

            After
noting that these precise arguments were not made in the trial court, the court
addressed Dr. Bidiwala’s complaints and affirmed the trial court’s order
denying his motion to dismiss.  Id. at *2–3. The court concluded that
the trial court did not make any inferences in reading the report.  Id.
at *2.  Further, the court noted that the expert, who was not present when the
statement regarding breathing was made and therefore could not state as a fact
that Dr. Bidiwala was present or heard the statement, “conditioned her opinion
on the breach of the standard of care based on facts contained in an affidavit
by [Susan Cockerell].”  Id.  Concluding that the expert’s reliance on
the mother’s affidavit did not render the expert’s opinions conclusory, the
court explained:

The only inference made was by the expert, who necessarily
inferred that if Dr. Bidiwala was present, he heard the statement.  Whether Dr.
Bidiwala was actually present and actually heard the statements by Melanie is a
fact that will have to be litigated later.  Here, the report informs the
defendant of the specific conduct called into question—failing to report
Melanie’s statement that she could not breach—and links that breach of the
standard of care to causation.

Id. 
Similarly, we conclude that Dr. Rotbart’s reliance on Traci Wyche’s statement
does not render his opinions conclusory or insufficient.  

            Therefore,
we overrule the appellants’ appeals to the extent they contend Dr. Rotbart’s
expert report is inadequate because he relies on Traci Wyche’s statement in
formulating his opinions.

C

            As
noted above, Dr. Allencherril separately appeals the trial court’s denial of
his motion to dismiss.  He argues in part that Dr. Rotbart’s expert report is
legally inadequate—as it is based entirely on speculation and
conjecture—because Dr. Rotbart relies on Traci Wyche’s statement.  We have
already explained that the trial court did not abuse its discretion in denying
the appellants’ motions to dismiss on this basis.  Additionally, Dr.
Allencherril argues on appeal that Dr. Rotbart’s opinion is conclusory “on the
basis that he uses hindsight and a bad outcome” to establish the standard of
care, breach of the standard of care, and causation.  As the Wyches point out, however,
Dr. Allencherril’s only argument in his motion below was the following: 
“Specifically, by relying upon an affidavit drafted by the Plaintiff, Dr.
Rotbart makes assumptions that are conclusory and fail to establish a causal
link between alleged failures of Dr. Allencherril and the ultimate alleged
injuries experienced by Kyla Wyche.”  Because we have already disposed of Dr.
Allencherril’s only preserved complaint on appeal, we overrule his separate
issue.

D

            We
turn next to the nurse practitioners’ appeal of the trial court’s motion to
dismiss the Wyches’ claims against them.  Nurse Armstrong’s expert report, like
Dr. Rotbart’s, contains a chronology of events drawn from Kyla’s medical-record
entries and Traci Wyche’s statement.  She then sets out the standard of care
for nurse practitioners Anselmo and Havins, and separately explains how each
allegedly breached the standard of care.  In summary, Nurse Armstrong opines
that Anselmo and Havins failed to assess Kyla’s symptoms, document them, report
them to the attending physician, obtain a wound culture, and intervene when the
attending physician failed to take appropriate action to treat Kyla as the
stated standard of care requires.  Nurse Armstrong then concludes by stating
that in her opinion, Anselmo and Havins were negligent and failed to provide
ordinary care for Kyla.  

1

            On
appeal, the nurse practitioners make three primary arguments:  (1) Nurse
Armstrong is statutorily disqualified from opining on medical causation; (2)
Dr. Rotbart’s report does not implicate the nurse practitioners and cannot be
read together with Nurse Armstrong’s expert report; and (3) both Dr. Rotbart’s
report and Nurse Armstrong’s reports are inadequate because they rely on Traci
Wyche’s statement.  The nurse practitioners do not challenge Nurse Armstrong’s
qualifications or her expert report as to standard of care and breach. 
Accordingly, the only question is whether the Wyches’ expert reports adequately
establish the element of causation. 

 

 

2

             Chapter
74 plainly requires that only a physician may opine on the causal relationship
between the injury, harm, or damages claimed and the alleged departure from the
applicable standard of care.  See Tex. Civ. Prac. & Rem. Code Ann. §
74.351(r)(5)(C), 74.403(a); Kelly v. Rendon, 255 S.W.3d 665, 675 (Tex. App.—Houston
[14th Dist.] 2008, no pet.) (“We agree with appellants that, under the statute,
a nurse is not qualified to render an opinion on medical causation.”).  The
Wyches do not dispute this.  They argue, however, that Dr. Rotbart’s report,
when read together with Nurse Armstrong’s report, satisfies the element of
causation as to the nurse practitioners.

            Specifically,
the Wyches contend that Dr. Rotbart’s report implicates the nurse practitioners
because Dr. Rotbart refers to them in his “Review of Facts”  as follows:

            On May 8, 2006 a peripheral IV was placed in
[Kyla’s] left foot.  On May 11, 2006 Carol Anselmo, NNP noted that the IV had
infiltrated and the left leg was red, edematous and firm.  Dr. Catherine Gannon
noted on May 11, 2006, “changes in exam: IV infiltrate left leg – puffy, red
calf.”

            On May 12, 2006 Carol Anselmo, NNP noted that
there was a pinpoint sized green pustule on the left foot.  The area was
cleansed with alcohol and the pustule was cleared.  Carol Anselmo, NNP noted
that she “discussed with Dr. Gannon.”  Dr. Gannon wrote a note that same day
stating that the clinical course and plan of care were reviewed and discussed
with the resident/neonatal nurse practitioner, fellow as documented in their
note.  Neither Dr. Gannon nor Carol Anselmo, NNP documented an assessment of
the left lower extremity.

            On May 13 and 14, 2006 Lisa Havins, NNP and
Jochen Profit, M.D. attended to Kyla Wyche.  Neither Lisa Havins, NNP nor
Jochen Profit, M.D. made any notes concerning the appearance of the left lower
extremity.

Additionally,
the Wyches contend Anselmo’s and Havins’s actions and omissions as set forth in
Nurse Armstrong’s report are linked to the facts and damages in Dr. Rotbart’s
report.  Nurse Armstrong details their acts and omissions resulting in the
failure to treat Kyla’s infection, and Dr. Rotbart discusses Anselmo’s and
Havins’s acts and omissions between May 8 and May 14.  The Wyches contend that
Dr. Rotbart links these acts and omissions in his report in the following
paragraphs:

            Infection within a vein is a complication that
may develop in peripheral intravenous lines for parenteral nutrition. 
Infection within the lumen of the cannulated vein may become a source of
bacteremia and sepsis and may progress to frank suppuration.  The signs and
symptoms of pediatric patients with an infected vein include swelling,
erythema, induration, palpable cord, tenderness, fever, skin that is warm or hot
to the touch, and pus.  The most frequent signs and symptoms of an infected
vein are swelling, erythema and induration.  Left untreated, the infection may
progress to cellulitis, osteomyelitis, septic hip arthritis and bacteremia as
it did in this case.

            Peripheral IVs that have infiltrated my
progress from infiltration to infection over hours to days.  The site must
therefore be carefully inspected on a frequent basis for signs of local
inflammation, a palpable cord or pus. If these signs are found and persist or
progress, empiric antimicrobial therapy should be initiated based on Gram stain
results when available and should include agents active against Staphylococcus
aureus.  In addition, blood cultures should be drawn.  Exploration and excision
of the vein is indicated if there is progression to suppurative
thrombophlebitis.  Treatment initiated during the early stages of vein
infection prevents progression and development of complications such as
cellulitis, osteomyelitis, septic hip arthritis, deep vein thrombosis and
septic thrombophlebitis.

. . .

Had Kyla Wyche received care and treatment of the infection
prior to discharge it is very likely the infection would not have progressed to
cellulitis, osteomyelitis, septic hip arthritis, septic thrombophlebitis,
bacteremia and other medical conditions which were diagnosed during her hospitalization
beginning May 22, 2006.

. . . 

Early care and treatment of localized infection is required
for curing the infection and preventing its predictably progressive course if
untreated.  In reasonable medical probability, care and treatment of Kyla Wyche’s
infection before discharge would have prevented the progression of the
infection to cellulitis, osteomyelitis, septic hip arthritis, septic
thrombophlebitis, bacteremia and the other medical conditions which were
diagnosed and treated during her readmission on May 22, 2006.  

Thus,
the Wyches contend, Anselmo’s and Havins’s acts and omission that caused Kyla
Wyche’s infection to progress into the injuries she sustained are the failure
to assess, document, culture, and treat, and Dr. Rotbart’s report links the
facts of the nurses’ failure to assess the infection, document the infection,
initiate antibiotics, and collaborate with the attending physician to the
progression of Kyla’s infection.  

            To
support their contention, the Wyches primarily rely on Regent Care Center of
Laredo, Limited Partnership v. Abrego, No. 04-07-00320-CV, 2007 WL 3087211
(Tex. App.—San Antonio Oct. 24, 2007) (mem. op.) and Martin v. Abilene
Regional Medical Center, No. 11-04-00303-CV, 2006 WL 241509 (Tex.
App.—Eastland Feb. 2, 2006, no pet.) (mem. op.).  In Martin, the
plaintiff alleged that a doctor and medical center were negligent in
discharging him after a cardiac catheterization procedure without a
prescription for Plavix.  2006 WL 241509, at *1.  The plaintiff provided expert
reports of a nurse and a doctor.  On appeal, the medical center contended that
the reports were deficient regarding causation as to its nurse because the
doctor’s report addressed only the doctor’s negligence.  Id. at *4.  The
court rejected this argument, concluding that when read together, the expert
reports alleged that if the nurse had informed the doctor of the lack of a
prescription for Plavix at the time of the plaintiff’s discharge, the doctor
should have prescribed Plavix when notified of the omitted prescription.  Id.
at *5.  

            Citing
Martin, the court of appeals in Abrego reached a similar
conclusion.  2007 WL 3087211, at *6.  In that case, a nursing-home facility
argued that the plaintiffs’ expert reports were deficient as to the nursing
home’s administrator because the plaintiffs’ sole expert report prepared by a
physician had addressed only the nursing home’s negligence and did not
specifically mention the nursing home’s administrator.  Id.  Relying on Martin,
the court concluded that when the physician’s expert report was read together
with the report of the plaintiffs’ expert on the standards of care and breaches
by nursing home administrators, the reports constituted a good-faith effort to
provide a fair summary of the causal relationship between the administrator’s
actions and the patient’s death.  Id.

            We
agree that the healthcare-liability statutes do not require a single expert to
address all liability and causation issues as to a defendant and the expert
reports should be read together when determining whether they represent a
good-faith effort to satisfy the statutory requirements.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(i); Packard, 252 S.W.3d at 526. 
Nevertheless, we conclude that in this case, even when read together, the
expert reports of Nurse Armstrong and Dr. Rotbart do not satisfy the element of
causation as to the nurse practitioners.  We reach this conclusion for several
reasons.  

            First,
although Dr. Rotbart does mention Anselmo and Havins in his review of facts, he
does not discuss them or Texas Children’s Hospital in the discussion section of
his report or in the sections devoted to standard of care, breach of the
standard of care, or causation.  Further, each section of Dr. Rotbart’s report
concerning standards of care, breach of the standard of care, and causation is
specifically identified by subheadings that specify which doctor’s conduct is
being addressed.  Thus, for example, it contains a section entitled “Standard
of Care for Dr. Gannon and Dr. Profit,” “Breach of the Standard of Care by Dr.
Gannon,” and “Breach of the Standard of Care by Dr. Profit.”  Similarly, Dr.
Rotbart includes sections entitled “Standard of Care for Paul Allencherril” and
“Breach of the Standard of Care by Dr. Allencherril.”  Nowhere in Dr. Rotbart’s
report does he include a similar section concerning the nurse practitioners.  Additionally,
the language the Wyches point to as setting out the causal relationship linking
Anselmo’s and Havins’s alleged actions and omissions to Kyla’s injuries is
contained in a section that is clearly directed only to Dr. Gannon and Dr.
Profit, as the paragraph begins:  “As a result of the breaches of the standard
of care by Dr. Gannon and Dr. Profit as I have outlined above . . . .”  Thus,
Dr. Rotbart’s report contains no allegations concerning causation directed to
the nurse practitioners.

            Moreover,
we decline to infer such allegations from Dr. Rotbart’s report.  An expert is
required to explain the basis for his statements and must link his conclusions
to the facts.  Bowie Mem’l Hosp., 79 S.W.3d at 52.  The expert report
must include the expert’s opinion on each of the elements identified in the
statute.  Palacios, 46 S.W.3d 878. A trial judge may not draw any
inferences, but must rely exclusively on the information contained within the
four corners of the report.  See Bowie Mem’l Hosp., 79 S.W.3d at 52; Palacios,
46 S.W.3d at 878; see also CHCA Mainland, L.P. v. Dickie, No.
14-07-00831-CV, 2008 WL 3931870, at *3 (Tex. App.—Houston [14th Dist.] Aug. 21,
2008, no pet.) (mem. op.) (“When determining whether the expert report
represents a good-faith effort, the trial court’s inquiry is limited to the
four corners of the report itself, and inferences are not permitted.”); Patel
v. Williams ex rel. Estate of Mitchell, 237 S.W.3d 901, 904 (Tex.
App.—Houston [14th Dist.] 2007, no pet.) (“In determining whether the report
represents a good faith effort, the trial court’s inquiry is limited to the four
corners of the report, and no inferences may be drawn from information outside
the report.”).  Because the expert reports of Nurse Armstrong and Dr. Rotbart
cannot be read to infer an allegation of causation as to the nurse
practitioners, we hold that the trial court abused its discretion in
determining that these reports satisfied the requirements of section 74.351.  See
Bowie Mem’l Hosp., 79 S.W.3d at 52–53.

            We
sustain that portion of the nurse practitioners’ issue.

3

            Lastly,
we turn to the nurse practitioners’ contention that because the Wyches’ expert
reports fail to address the element of causation as to them, the reports amount
to “no report at all” and so the trial court abused its discretion in failing to
dismiss the Wyches’ healthcare-liability claims with prejudice and award the
nurse practitioners their attorney’s fees and costs.  See Tex. Civ.
Prac. & Rem. Code Ann. § 74.351(b); Univ. of Tex. Med. Branch v.
Railsback, 259 S.W.3d 860, 865 (Tex. App.—Houston [1st Dist.] 2008, no
pet.).  Conversely, the Wyches request that we remand the case to the trial
court to consider a thirty-day extension to cure the deficiency.

            The
nurse practitioners strenuously assert that the Wyches’ expert reports cannot
constitute a good faith effort—and are equivalent to serving no report at all—because
their reports omit the statutory element of causation as to them.  See Rivenes
v. Holden, 257 S.W.3d 332, 334 (Tex. App.—Houston [14th Dist.] 2008, no
pet.); Bogar v. Esparza, 257 S.W.3d 354, 368 (Tex. App.—Austin 2008, no
pet.); Garcia v. Marichalar, 185 S.W.3d 70, 73 (Tex. App.—San Antonio
2005, no pet.); see also Jernigan v. Langley, 195 S.W.3d 91, 93–94 (Tex.
2006) (stating that a mere “passing reference” to a physician in a report,
without explanation of how the physician breached the standard of care or
caused the injury, would not constitute a sufficient report).  These cases and the
other similar cases the nurse practitioners rely on, however, involve the
expert’s failure to mention the complaining defendant at all or only in
passing.  See Rivenes, 257 S.W.3d at 337–38 (expert’s report that made
no mention of defendant doctor while specifically naming other defendants was
not a report at all as to doctor); Bogar, 257 S.W.3d at 368 (expert
report was no report at all because the defendant doctor was never mentioned
and no person’s conduct was implicated in report); Garcia, 185 S.W.3d at
71–72, 74 (trial court had no discretion to grant an extension when doctor was
not mentioned at all in report).  They do not stand for the proposition that an
expert report that is deficient as to one element is necessarily the equivalent
of “no report at all.”  Cf. Ogletree v. Matthews, 262 S.W.3d 316, 324
(Tex. 2007) (Willett, J., concurring) (“It is indisputable, for example, that a
‘report’ signed by a plumber is no report at all and merits swift dismissal, no
matter how brilliantly he describes how the defendant’s departure from accepted
standards of care caused the patient’s injury.  Likewise, a doctor- or
provider-signed record that totally omits the required statutory elements and
makes no colorable attempt to demonstrate liability is no report at all and
merits dismissal just as swift.”).  

            The
nurse practitioners also cite Hopkins County Hospital District v. Ray,
No. 06-08-00129-CV, 2009 WL 454338 (Tex. App.—Texarkana Feb. 24, 2009, no pet.)
(mem. op.), which they contend is “on all fours” with this case.  We disagree. 
In that case, Ray sued Hopkins Hospital after she fell from a hospital bed and
was injured. Id. at *1.  Ray served a report written by a nurse, which
Ray represented was the required expert report.  Id.  At the hearing on
the hospital’s motion to dismiss, Ray took the position that no expert report
was required on causation, and the trial court denied the hospital’s motion to
dismiss.  Id.  On appeal, the court held that, because the nurse was
disqualified by statute to render an opinion on causation, her report was
“tantamount to no report at all” and therefore “dismissal was mandatory.”  Id.
at *4.  Ray is distinguishable because in the present case the Wyches
have not taken a position obviously contrary to the chapter 74’s plain language
that no report is required as to causation; instead, they contend that Dr.
Rotbart’s report satisfies the causation requirement and cite Martin and
Abrego, discussed above, as supporting case law.  On these facts, we
conclude that, unlike the nurse’s report in Ray, the Wyches’ expert
reports were a good-faith, but deficient, effort to comply with the statutory
requirements as to the element of causation.

            The
nurse practitioners cite numerous other cases which they contend advance their
position, but they do not cite two recent supreme court cases that inform our
analysis:  Leland v. Brandal, 257 S.W.3d 204 (Tex. 2008), and In re
Buster, 275 S.W.3d 475 (Tex. 2008) (per curiam).  In Leland, the
supreme court held that section 74.351’s plain language permits one thirty-day
extension when the court of appeals finds deficient a report that the trial
court considered adequate.  257 S.W.3d at 207–08 (citing Tex. Civ. Prac. &
Rem. Code § 74.351(c)).  In reaching this conclusion, the court noted that the
Legislature, in enacting section 74.351, “struck a careful balance between
eradicating frivolous claims and preserving meritorious ones.”  Id. at
208.  

            In
Buster, the plaintiff served an expert report signed by a nurse, and the
defendant nursing home moved to dismiss on the ground that a physician’s report
was required on causation.  Id. at 476.  Before the hearing on the
motion, the plaintiff served a supplemental report and moved for a thirty-day
extension to allow the supplement to cure the deficiency.  Id.  The
trial court granted the extension and denied the nursing home’s motion to
dismiss.  Id.  On review, the supreme court held that the trial court
did not err in granting the extension, noting that “[a] report by an
unqualified expert will sometimes (though not always) reflect a good-faith
effort sufficient to justify a 30-day extension.”  Id. at 476–77.  The
court also held that the trial court did not err in allowing the supplemental
report from a physician.  Id. at 477. 

            Here,
the trial court found the reports adequate, and the Wyches relied on case law
they believed supported their argument that Dr. Rotbart’s report, read together
with Nurse Armstrong’s report, satisfied the element of causation.  On these
facts, and applying the reasoning of Leland and Buster, we
overrule this portion of the nurse practitioners’ issue.

*
* *

            On
these facts, we agree with the trial court’s determination that the expert
report of Dr. Rotbart was not inadequate because he relied on the unsworn
statement of Traci Wyche in formulating his opinions.  We disagree, however,
that Dr. Rotbart’s opinion, read together with Nurse Armstrong’s expert report,
satisfied the statutorily required element of causation as to the nurse
practitioners.  We therefore reverse that portion of the trial court’s judgment
denying the motion to dismiss of Lisa Havins, Carol Anselmo, and Texas
Children’s Hospital and remand to the trial court for consideration of the
Wyches’ request for an extension of time under section 74.351(c) to cure the
deficiencies in their expert-report submission.  We affirm the remainder of the
judgment.

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

Panel consists of Justices Yates,
Seymore, and Brown.









[1]
See Tex. Civ. Prac. & Rem. Code §§ 74.001–.507 (Vernon 2005 &
Supp. 2009).





[2]
In their original petition, the Wyches also sued River Oaks Hospital f/k/a
Twelve Oaks Hospital, but this entity is not a party to this appeal.  The
Wyches allege only vicarious liability against the hospitals and Baylor Medical
Center.





[3]
In his report, Dr. Rotbart states that he is a professor in the Department of
Pediatrics, Section of Pediatric Infectious Diseases, at the University of
Colorado School of Medicine, where he is also a professor in the Department of
Microbiology.  He is vice-chairman of the Department of Pediatrics at The
Children’s Hospital of Denver and the University of Colorado School of
Medicine.  He is board certified by the American Board of Pediatrics with a
sub-board in Infectious Diseases.  An extensive curriculum vitae is attached to
Dr. Rotbart’s report.  The defendants do not challenge Dr. Rotbart’s
qualifications.





[4]
We note that Dr. Gannon and Dr. Profit cite as support Collini v.
Pustejovsky, a medical-malpractice case in which the court held that the
plaintiff’s expert report failed to demonstrate his qualifications to opine
concerning the causal relationship between the prolonged use of the drug Reglan
and the development of tardive dyskinesia, a condition that causes involuntary
movement of the limbs, face, or tongue.  See 280 S.W.3d 456, 459–60
& n.1, 466 (Tex. App.—Fort Worth 2009, no pet.).  In that case, the
expert’s report failed to state that he had any experience or training
regarding Reglan or tardive dyskinesia, but the plaintiff argued that his
qualifications could be established by the fact that Reglan’s manufacturer had
disclosed tardive dyskinesia as a known complication and the report also
reflected that three physicians had diagnosed the plaintiff with dyskinesia
related to her Reglan use.  Id. at 466.  Citing Rule 703 and Gammill
v. Jack Williams Chevrolet, Inc, 972 S.W.2d 713, 728 (Tex. 1998), the court
noted that the expert’s report did not provide any background on the experience
or training of those physicians which would signal to the trial court that
their opinions were reliable.  Id.  The court also distinguished other
cases in which courts had held that an expert may rely on the opinions of other
experts whose qualifications to render reports or diagnoses had been
demonstrated.  Id.  But this case does not involve Dr. Rotbart’s
reliance on the opinions of other experts, and the appellants do not challenge
Dr. Rotbart’s qualifications.  Further, Collini does not address an
expert’s reliance on a description of the patient’s symptoms from the patient
herself or her representative. 





[5]
The appellants cite Baptist Hospitals of Southeast Texas v. Carter to
support their contention that Dr. Rotbart’s expert report fails to satisfy the
statutory requirements because it is based on “assumed facts not contained in or
corroborated by medical records.”  See No. 09-08-067-CV, 2008 WL
2917109, at *5 (Tex. App.—Beaumont July 31, 2008, no pet.).  In that case, the
court of appeals considered operative reports the defendant hospital introduced
in evidence to challenge the adequacy of the plaintiff’s expert report.  Id.
at *3.  The Beaumont court of appeals considered the operative reports,
reasoning that “the records the expert acknowledges he reviewed are relevant to
a court’s determining whether the report adequately relates the facts to the
expert’s opinion about causation.”  Id. at *4 n.4.  We disagree with
this reasoning because it is contrary to the supreme court’s instruction that
the inquiry regarding the adequacy of an expert report is limited to the four
corners of the report.  Bowie Mem’l Hosp. v. Wright, 79 S.W.3d 48, 52
(Tex. 2002); Palacios, 46 S.W.3d at 878; see also Mem’l
Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 758 (Tex. App.—Houston
[14th Dist.] 2007, no pet.) (declining to consider defendant’s extrinsic
evidence that expert was not qualified to opine, noting that the analysis is
limited to the four corners of the expert’s report and curriculum vitae). 
Moreover, this case does not involve the admission of medical records to
challenge the adequacy of an expert report.





[6]
The Wyches argue that Dr. Allencherril failed to complain below that Traci
Wyche’s statement was unsworn and unauthenticated, and therefore the argument
on appeal is waived.  The record below shows that Dr. Allencherril referred to
the statement as an “affidavit” and complained only that Dr. Rotbart’s reliance
on the affidavit rendered his opinions conclusory and insufficient to establish
causation.  Therefore, we agree that any complaint by Dr. Allencherril that
Traci Wyche’s statement was unsworn and unauthenticated is waived.  See
T.R.A.P. 33.1(a).  Because we conclude that it was not improper for Dr. Rotbart
to rely on the statement, however, the outcome of Dr. Allencherril’s appeal is
the same, with or without this argument.